UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN P. GANLEY,

Plaintiff,

v.

CITY OF NEW YORK, et al.,

Defendants.

No. 15-CV-8077 (KMK)

OPINION & ORDER

<u>Appearances</u>

Kevin P. Ganley
White Plains, NY
*Pro Se Plaintiff*

Erin Teresa Ryan, Esq.
Noreen M. Stackhouse, Esq.
New York City Law Department
New York, NY
*Counsel for Defendant City of New York*

David Bloom, Esq.
Jonathan D. Rubin, Esq.
Kaufman Borgeest & Ryan LLP
Valhalla, NY
*Counsel for Defendant Carol Blitstein*

Kelly Sandler
White Plains, NY
*Pro Se Defendant*

Michael Nicholas Romano, Esq.
Pilkington & Leggett, P.C.
White Plains, NY
*Counsel for Defendant White Plains Hospital*

William Harold Bave, Esq.
Wilson, Bave, Conboy, Cozza & Cozza, P.C.
White Plains, NY
*Counsel for Defendant Westchester Medical Center*

Charles A. Collins, Jr., Esq.
Collins, Fitzpatrick & Schoene, LLP
White Plains, NY
*Counsel for Defendant Saint Vincent's Hospital Westchester*

KENNETH M. KARAS, District Judge:

Kevin P. Ganley ("Plaintiff"), proceeding pro se, brought this suit alleging that the City of New York, Carol Blitstein, Kelly Sandler, White Plains Hospital, Westchester Medical Center, and Saint Vincent's Hospital Westchester (collectively, "Defendants") violated his rights through the mental health treatment administered to Plaintiff approximately 20 years ago. (*See* Compl. (Dkt. No. 1).)[1]  Before the Court are Defendants' Motions To Dismiss the Complaint. (*See* Dkt. Nos. 37, 39, 40, 48, 56, 61.)  For the reasons below, the Court grants the Motions and dismisses the Complaint without prejudice.

## I.  Background

### A.  Factual Background

The following facts are taken from the Complaint and are presumed true for the purposes of these Motions.

In the late summer of 1994, Plaintiff, a New York City police officer since 1987, and his then-wife, Defendant Sandler ("Sandler"), began experiencing marital troubles, to the point that one evening, Plaintiff "remove[d] [himself] from [his] place of residence" and slept elsewhere. (Decl. of Erin Ryan in Supp. of Def.'s Mot. To Dismiss Ex. A ("Numbered Compl.") ¶¶ 13–14

---

[1] Plaintiff spells Blitstein's name differently (Blitzstein) and offers a slightly different name for Saint Vincent's Hospital Westchester (St. Vincent's Hospital) from Defendants. (*See* Compl.)  The Court presumes that the spelling and names offered by Defendants in their motion papers are accurate.

(Dkt. No. 42).)[2]  Plaintiff sought the assistance of the New York City Police Department's counseling unit, which told Plaintiff that it did not see a reason to visit Plaintiff and Sandler in their home.  (*Id.* ¶¶ 14–15.)  Plaintiff was advised, however, that he should voluntarily surrender his firearms as part of the counseling unit's early intervention program.  (*Id.* ¶¶ 16–17.) Following his discussion with the counseling unit, Plaintiff received a call from Sandler apologizing for her behavior and asking Plaintiff to come back and reconcile.  (*Id.* ¶ 18.) Plaintiff inferred from this that the counseling unit had contacted Sandler without notifying Plaintiff.  (*Id.*)

As part of the counseling program, Plaintiff was evaluated by Dr. Andrew, who instead of having an "intellectual conversation with [Plaintiff] man to man," simply asked Plaintiff to write down everything that was going on and sent Plaintiff on his way.  (*Id.* ¶ 19.)  Plaintiff and his spouse agreed to meet with Defendant Carol Blitstein ("Blitstein"), who offered marriage therapy counseling.  (*Id.*)  At that time, Blitstein also was providing therapy to Plaintiff's mentally ill brother.  (*Id.*)  Plaintiff did not feel that Blitstein's counseling strategies were effective, and Blitstein became "very hostile and angry" after Plaintiff objected that the marriage had deteriorated since he and Sandler had begun seeing Blitstein.  (*Id.* ¶ 20.)  Plaintiff became frustrated and informed Blitstein and Sandler that he was "calling it quits."  (*Id.* ¶ 21.)

Following the fallout with Blitstein and following more conflict with Sandler, Plaintiff felt compelled to again remove himself from the home he shared with Sandler.  (*Id.* ¶ 22.) Realizing that his blood pressure was beginning to rise, Plaintiff checked in at Defendant White Plains Hospital.  (*Id.*)  Upon arriving there, Plaintiff noted that Blitstein was at the hospital and

---

[2] For ease of reference, the Court cites here to the numbered Complaint offered by the City of New York.

observed Blitstein speaking to the hospital staff while Plaintiff was recovering from his rise in blood pressure. (*Id.*) Plaintiff alleges that Blitstein and Sandler then "illegally, intentionally[,] and without due cause misl[ed] [Plaintiff] into the mental health system." (*Id.* ¶ 23.) More specifically, while Plaintiff was recovering in the emergency room, a staff member of White Plains Hospital led him into a locked psychiatric ward. (*Id.* ¶ 24.) The unnamed doctor who examined Plaintiff did not answer Plaintiff's questions about what was going on, only telling Plaintiff that he could not leave. (*Id.*) Plaintiff alleges that upon being told that he was restrained from leaving, he "became anxious and . . . began to experience a fight or flight situation and feared for [his] safety and [his] life at that time." (*Id.* ¶ 25.) When Plaintiff attempted to leave the psychiatric ward, he was restrained and sedated by the hospital staff. (*Id.* ¶ 26.) Plaintiff alleges he was "given massive amounts of very serious mind altering neuroleptic drugs against [his] will on a daily basis without [his] consent to do so." (*Id.*) Plaintiff demanded that he be released to another hospital after he began to experience "very ill zombie like reactions from these drugs." (*Id.*)

Presumably as a result of his request, Plaintiff was transferred to Defendant Westchester Medical Center. (*Id.* ¶ 27.) There, Plaintiff was "further subjected to daily doses of these serious mind altering neuroleptic drugs." (*Id.*) At some point, a friend and one of Plaintiff's brothers arrived at the hospital seeking Plaintiff's release. (*Id.*) They were rebuffed, and Plaintiff was transferred to Defendant Saint Vincent's Hospital Westchester. (*Id.*) At this time, Plaintiff felt "dazed and confused by the effects of these drugs [he] was being given on a daily basis." (*Id.* ¶ 28.) Plaintiff refused to continue taking the medication, alleging that he was "clearly being forcibly drugged by coercion as part of this fraud." (*Id.*)

4

Plaintiff was finally released, though Plaintiff does not specify on what date he was released or how long he was receiving involuntary treatment from Defendants.  (*Id.* ¶ 29.) Plaintiff went back to live with Sandler, though he continued to see Dr. Olko from Saint Vincent's Hospital Westchester on an outpatient basis.  (*Id.*)  Dr. Olko refused to acknowledge that Plaintiff had been mistreated and refused Plaintiff's request to be taken off the "very debilitating dangerous mind altering neuroleptic drugs," which Plaintiff believed were the cause of numerous side effects.  (*Id.* ¶¶ 29–30.)  When Plaintiff learned that he had been diagnosed with the same mental illnesses as one of his brothers and disputed this diagnosis with Dr. Olko, Dr. Olko denied Plaintiff's allegations of fraud or mistreatment.  (*Id.* ¶ 31.)  Plaintiff alleges that as a result of his accusations of fraud, Dr. Olko "illegally and vindictively" reported the erroneous diagnosis to the New York State Office of Mental Health and the New York City Police Department.  (*Id.* ¶ 32.)

Following his conflict with Dr. Olko, Plaintiff sought out treatment from an outside doctor who began to help Plaintiff "slowly rid [himself] [of] these serious and very addictive dangerous mind altering neuroleptic drugs."  (*Id.* ¶ 33.)  Sandler advised Plaintiff to continue to take his medication.  (*Id.* ¶ 34.)  Plaintiff later had to return to White Plains Hospital and was again involuntarily taken to the psychiatric ward where he was seen by Dr. Bremen.  (*Id.*) Plaintiff was released shortly thereafter with new medication.  (*Id.*)  The new medication caused even worse side effects for Plaintiff, who felt like his "brain was in fact turning to mush."  (*Id.*) Sandler observed Plaintiff's condition and informed Dr. Bremen, who reduced the dosage of the medication.  (*Id.* ¶ 35.)  The side effects subsided, but Plaintiff nevertheless had to return to Saint Vincent's Hospital Westchester as a result of the "side effects from the dangerous mind altering neuroleptic drugs."  (*Id.*)

Around August of 1996, Plaintiff spoke to his union delegate, who informed Plaintiff that he had spoken with Sandler and she had indicated she wanted a divorce because she had learned that Plaintiff was suffering from a life-long mental illness and would need medication for the rest of his life.  (*Id.* ¶ 36.)  Plaintiff thereafter separated from Sandler and, following another confrontation, received an order of protection against her.  (*Id.*)  Plaintiff states that "[d]uring [this] time, [he] was seeing an outside therapist and slowly coming off the dangerous mind altering neuroleptic drugs . . . and . . . was starting to feel better having done so."  (*Id.*)  Sandler obtained her own order of protection against Plaintiff and allegedly lured Plaintiff over to her home and had him arrested for violating that order.  (*Id.*)  As a result of violating that order, Plaintiff was given a hearing in 1997 and subsequently "illegally and maliciously forced out of [his] job within law enforcement," receiving one-half disability pay.  (*Id.* ¶¶ 37–38.)  Plaintiff thereafter divorced Sandler in 1998.  (*Id.* ¶ 38.)

Following the divorce from Sandler, Plaintiff was "clearly deemed by an outside [doctor] . . . not [to] be in need of any of these very dangerous drugs" and "truly felt recovered."  (*Id.*)  Plaintiff became a self-employed home improvement contractor and has operated in White Plains, New York for the past 20 years.  (*Id.*)  He has remarried and now has a nine-year-old son.  (*Id.*)  Plaintiff alleges that he waited nearly 20 years to bring this lawsuit because

> [a]s a result of these very serious injuries that I sustained at the time I was in fact unable to bring forth at the earlier time any type of civil action on my behalf so as to seek damages for my injuries I sustained until I began to consciously begin to awaken, realize and discover on my own at this present time the full extent and impact these injuries had on me as a result of this criminality . . . .

(*Id.*)

6

### B.  Procedural History

Plaintiff filed his Complaint on October 14, 2015.  (Dkt. No. 1.)  Sandler, Westchester

Medical Center, and Saint Vincent's Hospital Westchester filed answers on November 10,

November 20, and December 2, 2015, respectively.  (*See* Dkt. Nos. 3, 12, 20.)  Following a

conference on February 10, 2016, (*see* Dkt. (minute entry for Feb. 10, 2016)), all Defendants

were given leave to file Motions To Dismiss, (*see* Mot. Scheduling Order (Dkt. No. 35)).

Defendants filed their Motions To Dismiss between March 10 and March 18, 2016, (*see* Dkt.

Nos. 37, 39, 40, 48, 56, 61), and Plaintiff responded on April 11, 2016, (*see* Dkt. No. 68).

Defendants filed their replies between April 21 and 25, 2016.  (*See* Dkt. Nos. 71, 73, 78, 80, 81,

83.)  Plaintiff filed a surreply on June 2, 2016.  (*See* Dkt. No. 89.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks

omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of*

*Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

B.  Analysis

It is not clear upon what basis Plaintiff brings this suit.  Defendants are in apparent agreement that Plaintiff is, at the very least, intending to plead a claim pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights.  (*See, e.g.*, Def. City of New York's Mem. of Law in Supp. of Its Mot. To Dismiss the Compl. ("City Mem.") 5 (Dkt. No. 44); Mem. of Law of Def., White Plains Hospital, in Supp. of Mot. To Dismiss ("White Plains Mem.") 5 (Dkt. No. 52); Mem. of Law in Supp. of Def. Saint Vincent's Hospital Westchester, s/h/a St. Vincent's Hospital's Mot. To Dismiss ("Vincent Mem.") 9 (Dkt. No. 58).)  To the extent Plaintiff is raising additional claims, Defendants are in agreement that those claims arise under state law.  (*See, e.g.*, White Plains Mem. 5; Vincent Mem. 9.)

The chief argument advanced by Defendants is that Plaintiff's Complaint is untimely, as the events giving rise to the cause of action occurred nearly 20 years prior to the filing of the Complaint.  (*See, e.g.*, City Mem. 5–7.)  Defendant City of New York additionally argues that Plaintiff has not stated a claim for municipal liability and has failed to comply with the statutory requirements for filing a claim against a municipality.  (*See* City Mem. 9–13.)  Blitstein also argues that Plaintiff has failed to allege any state action on her part or any conspiracy that would

9

give rise to § 1983 liability, (*see* Mem. of Law in Supp. of Def. Carol Blitstein's Mot. To

Dismiss ("Blitstein Mem.") 7–10 (Dkt. No. 41)), an argument that Sandler, proceeding pro se,

appears to also raise, (*see* Affirmation in Supp. of Mot. ("Sandler Affirmation") (Dkt. No. 38)).

Accordingly, the Court will first consider whether Plaintiff's Complaint is timely.

1.  Timeliness

There is no federal statute of limitations for § 1983 claims.  *See Wilson v. Garcia*, 471

U.S. 261, 266–67 (1985), *superseded by statute on other grounds as recognized in Jones v. R.R.*

*Donnelley & Sons Co.*, 541 U.S. 369, 377–81 (2004).  "[W]here state law provides multiple

statutes of limitations for personal injury actions, courts considering § 1983 claims should

borrow the general or residual statute for personal injury actions."  *Owens v. Okure*, 488 U.S.

235, 249–50 (1989).  In New York, C.P.L.R. § 214 set forth a three year statute of limitations for

actions for personal injury.  N.Y. C.P.L.R. § 214(5).  New York law also determines "whether

the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of

[§] 1983."  *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007) (citing *Pearl v. City of Long*

*Beach*, 296 F.3d 76, 80 (2d Cir. 2002)).  Federal law determines when such claims accrue, and

the Second Circuit has held that a § 1983 claim accrues when the plaintiff "knows or has reason

to know of the injury which is the basis of his action."  *Singleton v. City of New York*, 632 F.2d

185, 191 (2d Cir. 1980) (internal quotation marks omitted); *see also Shomo v. City of New York*,

579 F.3d 176, 181 (2d Cir. 2009) ("A [§] 1983 claim ordinarily accrues when the plaintiff knows

or has reason to know of the harm." (internal quotation marks omitted)).

Although the statute of limitations is an affirmative defense, it "may be raised by a pre-

answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if

the defense appears on the face of the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152

F.3d 67, 74 (2d Cir. 1998); *see also Ellis v. Wilkinson*, 81 F. Supp. 3d 229, 234 (E.D.N.Y. 2015) (same).

Plaintiff's sole federal claim accrued, at the latest, in 1998, when the alleged misconduct by Defendants ceased and Plaintiff was "clearly deemed by an outside [doctor] . . . not [to] be in need of any of these dangerous drugs" and "truly felt recovered." (Numbered Compl. ¶ 38.) Accordingly, Plaintiff's § 1983 claim, which is subject to a three year statute of limitations but which was not filed until 2015, is untimely unless some tolling provision or doctrine applies.

While the Court takes no position on whether Plaintiff intended to plead or has adequately pleaded any state causes of action, the statutes of limitations for such claims are governed by a variety of New York statutes. *See, e.g.*, N.Y. C.P.L.R. §§ 213(2) (six years for contract claims), 213(8) (six years for fraud claims), 214(4) (three years for trespass claims), 214-a (two years and six months for medical malpractice claims), 215(3) (one year for intentional tort claims). However, if Plaintiff's § 1983 claim is untimely and cannot be tolled, the Court will properly decline to exercise supplemental jurisdiction over Plaintiff's state law claims, as "[i]t is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims." *Carter v. City of New York*, No. 13-CV-1839, 2014 WL 4953641, at *5 n.7 (S.D.N.Y. Sept. 30, 2014) (internal quotation marks omitted); *see also Erie Grp. LLC v. Guayaba Capital, LLC*, 110 F. Supp. 3d 501, 511 n.68 (S.D.N.Y. 2015) (same).

### a.  New York Civil Practice & Rules § 208

Plaintiff avers in his Complaint that he was "unable to bring forth at the earlier time any type of civil action on [his] behalf so as to seek damages for [his] injuries [he] sustained until [he] began to consciously begin to awaken, realize and discover on [his] own at this present time

the full extent and impact these injuries had on [him]." (Numbered Compl. ¶ 38.) Defendants

primarily argue that Plaintiff is not entitled to tolling for insanity pursuant to C.P.L.R. § 208

because Plaintiff does not meet the requirements for insanity under that statute. (*See, e.g.*, City

Mem. 7–8; White Plains Mem. 5–8; Vincent Mem. 10–11.) Plaintiff argues in response that the

statute of limitations did not begin to run until 2013 because that was the time he

> clearly and on [his] own began to discover [his] injuries that were clearly
> unbeknownst to [him] and unable to both recognize and or comprehend to the
> severity of such and therefore seek treatment which in fact was on or around 2013
> and at that time [he] was diagnosed by Mr. Alfred [V]ent and several other
> therapists with [posttraumatic stress disorder] delayed onset.

(Pl.'s Resp. in Opp. to Defs.' Mots. ("Pl.'s Resp.") at unnumbered 1 (Dkt. No. 68).)

> N.Y. C.P.L.R. § 208 provides, in full:

> If a person entitled to commence an action is under a disability because of infancy
> or insanity at the time the cause of action accrues, and the time otherwise limited
> for commencing the action is three years or more and expires no later than three
> years after the disability ceases, or the person under the disability dies, the time
> within which the action must be commenced shall be extended to three years after
> the disability ceases or the person under the disability dies, whichever event first
> occurs; if the time otherwise limited is less than three years, the time shall be
> extended by the period of disability. *The time within which the action must be
> commenced shall not be extended by this provision beyond ten years after the cause
> of action accrues, except, in any action other than for medical, dental or podiatric
> malpractice, where the person was under a disability due to infancy.* This section
> shall not apply to an action to recover a penalty or forfeiture, or against a sheriff or
> other officer for an escape.

N.Y. C.P.L.R. § 208 (emphasis added). Although Defendants argue rigorously that Plaintiff does

not meet the standard for disability under the law of New York, this argument is moot. The

statute is clear on its face that even if Plaintiff qualified for the tolling provided in this statute by

virtue of insanity, "[t]he time within which the action must be commenced shall not be extended

by this provision beyond ten years after the cause of action accrues." *Id.* Plaintiff's cause of

action accrued, at the latest, 17 years before the filing of the Complaint. The statute, which can

extend the statute of limitations only up to 10 years, cannot salvage a claim that accrued 17 years before a complaint was filed.  *See, e.g.*, *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 193 (E.D.N.Y. 2014) ("Thus, for insanity, as opposed to infancy, C.P.L.R. § 208 only tolls the statute of limitations for a maximum of ten years from accrual of the otherwise time-barred claim."); *Bloch v. Pike*, No. 09-CV-5503, 2010 WL 2606355, at *2 (E.D.N.Y. May 20, 2010), *adopted by* 2010 WL 2606270 (E.D.N.Y. June 22, 2010) ("N.Y. C.P.L.R. [§] 208 permits tolling of the statute of limitations on grounds of disability for a maximum of ten years. Because the cause of action asserted in [the] plaintiff's original complaint arose in or about 1969, [the] plaintiff's disability does not save her claim from being time-barred [where the complaint was filed in 2009]."); *Makas v. Benjamin*, No. 09-CV-129, 2009 WL 3871441, at *3 (N.D.N.Y. 2009) ("If a person is under a disability because of insanity at the time the cause of action accrues, the time for commencing the action can be extended. . . .  Tolling, however, shall not be extended beyond ten years after the cause of action accrues." (alteration and internal quotation marks omitted)); *Harr v. Biernbaum*, 673 N.Y.S.2d 342, 342 (N.Y. App. Div. 1998) (holding that the lower court "properly dismissed the complaint on the merits because . . . the [s]tatute of [l]imitations had expired," noting that "[t]he maximum 10-year tolling period set forth in CPLR [§] 208 is measured from the date of accrual of [the] plaintiff's cause of action").  There is thus no statutory basis upon which Plaintiff's § 1983 claim may be tolled for 17 years.

### b.  Equitable Tolling

The Court next considers whether the doctrine of equitable tolling can salvage Plaintiff's claim.  With respect to equitable tolling in § 1983 actions, "it is well-settled that federal courts should borrow the forum state's tolling rules."  *Ellis*, 81 F. Supp. 3d at 235 (citing *Pearl*, 296 F.3d at 80).  The Second Circuit has explained that New York courts have adopted the same

equitable tolling doctrine that exists under federal law.  *See Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983).  "Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances."  *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996).  Thus, "[a]s a general matter, a litigant seeking equitable tolling must establish two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'"  *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010) (quoting *Lawrence v. Florida*, 549 U.S. 327, 336 (2007)).  "[E]quitable tolling requires a party to pass with reasonable diligence through the period it seeks to have tolled."  *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 134 (2d Cir. 2000) (internal quotation marks omitted).  If, for instance, "the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action."  *Keating*, 706 F.2d at 382.  However, equitable tolling applies "only in the rare and exceptional circumstance."  *Bertin v. United States*, 478 F.3d 489, 494 n.3 (2d Cir. 2007) (internal quotation marks omitted).

The Second Circuit has held that "mental illness can warrant equitable tolling of a statute of limitations," though such claims are "highly case-specific."  *Bolarinwa*, 593 F.3d at 232 (internal quotation marks omitted).  The party seeking such tolling must provide "a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights."  *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).  A court considering whether a mental impairment justifies equitable tolling should consider "all of the circumstances of the case."  *Canales v. Sullivan*, 936 F.2d 755, 759 (2d Cir. 1991).  A plaintiff seeking equitable tolling must demonstrate that her disability "severely impair[ed] her ability to comply with the filing deadline, despite her diligent efforts to do so."  *Bolarinwa*, 593

F.3d at 232; *see also Boos*, 201 F.3d at 185 ("The burden of demonstrating the appropriateness

of equitable tolling . . . lies with the plaintiff.").

Plaintiff's allegations do not satisfy his burden for equitable tolling.  For example,

Plaintiff does not allege that he was mentally incapable of filing his lawsuit during the 17-year

lapse between the end of the allegedly unlawful conduct and the filing of this lawsuit.  Nor does

he allege or allude to any facts showing that his condition "adversely affected [his] capacity to

function generally or in relationship to the pursuit of [his] rights."  *Boos*, 201 F.3d at 185.  And

there is no allegation that his condition prevented him from "comprehending [his] right to

judicial review."  *Canales*, 936 F.2d at 759.  Instead, Plaintiff merely alleges that it was not until

2013 that he began to understand the full extent of the injuries allegedly caused by Defendants.

(*See, e.g.*, Numbered Compl. ¶ 38 (claiming that it was not until after 1998 that he began to

"awaken, realize and discover on [his] own at this present time the full extent and impact these

injuries had on [him]"); Pl.'s Resp. at unnumbered 1 (arguing that it was not until "present day"

that he "began to discover [his] injuries that were clearly unbeknownst to [him] and unable to

both recognize and or comprehend the severity of such"); Pl.'s Mot. for Leave to File Am. Mot.

("Pl.'s Reply") at unnumbered 2 (Dkt. No. 89) (arguing that it was not until 2013 that he "was

able to become consciously aware of these damages and injuries").)  Such allegations do not

suggest that Plaintiff lacked an ability to appreciate his rights and bring suit.  *See Boos*, 201 F.3d

at 185 ("[The plaintiff's] conclusory and vague claim, without a particularized description of

how her condition adversely affected her capacity to function generally or in relationship to the

pursuit of her rights, is manifestly insufficient to justify any further inquiry into tolling.");

*Chalasani v. Fran*, No. 13-CV-6535, 2015 WL 2129773, at *8 (S.D.N.Y. Feb. 13, 2015) ("[The

plaintiff's] . . . barebones statement of depression in her complaint do[es] not plausibly allege

that she suffered mental illness sufficient to rise to the necessary level of an 'extraordinary hardship' for the purposes of equitable tolling."), *adopted by* 2015 WL 2137707 (S.D.N.Y. May 6, 2015); *De Los Santos v. Ercole*, No. 07-CV-7569, 2013 WL 1189474, at *6 (S.D.N.Y. Mar. 22, 2013) ("While [the] [p]etitioner alleges that he has been housed in . . . psychiatric centers . . . , this fact is insufficient to warrant equitable tolling unless [the] [p]etitioner clearly demonstrates that being housed in these facilities prevented him from exercising his legal rights."); *Green v. Sheehan*, No. 12-CV-665Sc, 2012 WL 3561978, at *2 (W.D.N.Y. Aug. 13, 2012) (declining to apply equitable tolling where the plaintiff "ha[d] not presented more than conclusory factual statements" in support of his claim for equitable tolling).

In his response to the Motions, Plaintiff submits documentary evidence in support of his argument for tolling, but none of those documents establishes an entitlement to equitable tolling. The email from Plaintiff's psychotherapist, Alfred J. Vent, dated July 24, 2015, merely states that Plaintiff's posttraumatic stress disorder "began to emerge some two years ago" and that Plaintiff "has not been able to work since." (*See* Pl.'s Resp. at unnumbered 7.)  Even assuming the truth of this document, which is at odds with Plaintiff's representation elsewhere in the record that he is currently self-employed and earning wages of $1,000 a month, (*see* Appl. to Proceed Without Prepaying Fees or Costs 1 (Dkt. No. 69); *see also* Numbered Compl. ¶ 38), this email establishes nothing except that Plaintiff still experiences detrimental effects from the allegedly wrongful conduct of Defendants.[3]  The email says nothing about Plaintiff's ability to bring this lawsuit sometime before 2015.

---

[3] Plaintiff's Application to Proceed Without Prepaying Fees or Costs is included in the same docket entry as his Application for the Court to Request Pro Bono Counsel.  (*See* Dkt. No. 69.)

The remainder of the documents submitted by Plaintiff relate to his argument that the term "insanity" should be used "in a positive sense," and that he suffered from a "clear and present positive insanity in that [he] was able to in fact still function in society and accomplish what [he] did during that time period while [he] was surviving with so long the very serious and psychological and physical damages and injuries as [he] claim[s]." (Pl.'s Reply at unnumbered 3; *see also id.* Exs. A–E.) But whatever merit Plaintiff's view of the term "insanity" may have in the medical community and elsewhere, the sole issue for this Court is whether Plaintiff has alleged facts providing "a particularized description of how [his] condition adversely affected [his] capacity to function generally or in relationship to the pursuit of [his] rights." *Boos*, 201 F.3d at 185. It is not the mere applicability of the term "insanity" to Plaintiff's state-of-mind that gives rise to a claim of equitable tolling. Rather, equitable tolling is appropriate only where some "mental impairment prevented [the plaintiff] from comprehending [his] right to judicial review." *Canales*, 936 F.2d at 759. That Plaintiff's condition between 1994 and 2013 may, in some sense, be viewed as a type of insanity, does not mean Plaintiff has met his burden to establish equitable tolling. Even taking all of the facts Plaintiff alleges as true, Plaintiff has not met that burden and is not entitled to equitable tolling of his claims.

To the extent Plaintiff is suggesting that his claim did not accrue until 2013, this argument is unavailing. Plaintiff admits that following his discharge from involuntary mental health treatment in 1996, he brought Defendants' allegedly wrongful conduct to the attention of Dr. Olko, believing that his legal rights had been violated. (*See* Numbered Compl. ¶ 29–30.) Plaintiff thereafter began to investigate the circumstances of his treatment and again confronted Dr. Olko with allegations of wrongdoing on the part of Defendants. (*See id.* ¶ 31.) Plaintiff then sought treatment from an outside doctor "to slowly rid [himself] from these serious and very

17

addictive dangerous mind altering drugs." (*See id.* ¶ 33.) Plaintiff also makes reference to the "very visible and traumatic injuries" that he suffered between 1997 and 1998. (*See id.* ¶ 37.) And, of course, Plaintiff was forced to retire in 1997. (*Id.* ¶¶ 37–38.) There is thus little doubt, taking Plaintiff's allegations as true, that he was aware that he had been injured by Defendants' conduct by at least 1998. And it is no answer for Plaintiff to say that he was unable to "recognize and or comprehend the severity" of his injuries, (*see* Pl.'s Resp. at unnumbered 1), as a cause of action accrues even if a plaintiff is unaware of the full extent of his injuries, *see Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) ("The cause of action accrues even though the full extent of the injury is not then known or predictable." (internal quotation marks omitted)); *Singleton v. Clash*, 951 F. Supp. 2d 578, 589 (S.D.N.Y. 2013) ("While the plaintiffs may not have recognized the extent of their injuries, they were aware of the defendant's conduct towards them and could have brought claims."), *aff'd sub nom. S.M. v. Clash*, 558 F. App'x 44 (2d Cir. 2014); *J.D. ex rel. Doe v. United States*, No. 10-CV-4296, 2011 WL 292010, at *8 (S.D.N.Y. 2011) ("A plaintiff simply may not 'postpone bringing an action until the full extent of that damage is ascertained.'" (quoting *Toal v. United States*, 438 F.2d 222, 225 (2d Cir. 1971)), *aff'd sub nom. Dominguez ex rel. Dominguez v. United States*, 468 F. App'x 23 (2d Cir. 2012). Plaintiff's § 1983 claim thus accrued, at the latest, in 1998, and because no tolling is available, his claim, filed in 2015, is untimely.

### 2. *Monell* Liability

The City of New York also seeks to dismiss Plaintiff's claim against it on the ground that Plaintiff has failed to state a claim under § 1983 for municipality liability pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). "To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him

of a federal constitutional or statutory right." *Sykes*, 723 F.3d at 405–06.  "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691.  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Apr. 16, 2010); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Jan. 3, 2011) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).  The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a

"direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").  "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003).  Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Roe*, 542 F.3d at 37 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).  Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation.  There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

Plaintiff has not made any attempt to identify a formal policy or informal custom of the City of New York that caused his injuries, nor as he suggested that city officials responsible for establishing municipal policies caused his deprivation or that city employees were improperly trained.  In fact, as the City of New York points out, (*see* City Mem. 9–10), Plaintiff does not identify any specific city official as violating his constitutional rights.  But even were the Court to accept Plaintiff's allegations regarding the conduct of New York City Police Department

counselors as alleging misconduct on the part of specific city officials, (*see* Numbered Compl. ¶¶ 14–19), Plaintiff fails to identify any municipal policy or conduct of decision-making New York City officials that caused his injuries, and thus Plaintiff has failed to state a claim against the City of New York pursuant to *Monell*, *see City of Canton*, 489 U.S. at 385 (noting that there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

### 3.  State Action

Blitstein separately argues that she cannot be held liable under § 1983 because there is no allegation that she acted under color of state law and there is no allegation that she conspired with state actors to violate Plaintiff's rights.  (Blitstein Mem. 7–10.)  Sandler also suggests, in her pro se Motion, that she cannot be held liable in her capacity as an individual.  (*See* Sandler Affirmation.)

As set forth above, to establish a constitutional violation under § 1983, a plaintiff must demonstrate that (1) the defendants were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived him or her of a federal constitutional or statutory right.  *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743–44 (2d Cir. 2003).  The first prong requires the plaintiff to show that the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  Liability may thus generally be imposed only upon defendants "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it."  *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (internal quotation marks omitted).  A plaintiff may, however, show that a private actor acted

under color of state law under a theory of conspiracy if "the private actor [was] a willful

participant in joint activity with the State or its agents." *Betts v. Shearman*, 751 F.3d 78, 84 (2d

Cir. 2014) (internal quotation marks omitted).  A private actor may only be a "willful

participant" with the State "if the two share some common goal to violate the plaintiff's rights."

*Id.* at 85.  "A merely conclusory allegation that a private entity acted in concert with a state actor

does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. County of

Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).  Rather, in order to survive a motion to dismiss on a

§ 1983 conspiracy claim, a plaintiff must allege "(1) an agreement between a state actor and a

private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done

in furtherance of that goal causing damages." *Id.* at 324–25.

There is little question that Blitstein and Sandler, neither of whom Plaintiff alleges were

employees of the State, were not acting directly on behalf of the State.  The Court thus construes

Plaintiff's Complaint as alleging that Blitstein and Sandler acted in conspiracy with state actors

to deprive him of his constitutional rights.  In that respect, however, Plaintiff has failed to

successfully allege a § 1983 conspiracy claim against either Blitstein or Sandler.

First, there is no allegation of an agreement between Blitstein and a state actor or between

Sandler and a state actor.  Plaintiff does allege that Blitstein spoke with the staff at White Plains

Hospital immediately prior to his commitment, (*see* Numbered Compl. ¶ 22), but such facts do

not suffice to allege a conspiratorial agreement, *see, e.g.*, *K.D. ex rel. Duncan v. White Plains

Sch. Dist.*, 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013) (dismissing a § 1983 conspiracy claim

where "the [c]omplaint [did] not set forth *any* specific facts that indicate *any* sort of meeting of

the minds between [the private actor] and the [state actor], let alone an agreement to violate [the

plaintiffs'] Fourth and Fourteenth Amendment rights"); *Fisk v. Letterman*, 401 F. Supp. 2d 362,

377 (S.D.N.Y. 2005) ("Alleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights."); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 513 (S.D.N.Y. 2003) (dismissing a § 1983 conspiracy claim where the plaintiff's "conspiracy reference d[id] not refer to an agreement or state with whom [the defendant] [was] alleged to have conspired or how the agreement to conspire was reached"). And Plaintiff sets forth no facts upon which to conclude that Sandler effected an agreement with state actors to deprive Plaintiff of his rights.

Plaintiff has additionally failed to allege an overt act by either Blitstein or Sandler in furtherance of the alleged conspiracy. Again, Plaintiff makes general reference to Blitstein's presence at White Plains Hospital when Plaintiff initially checked himself in for high blood pressure, (*see* Numbered Compl. ¶ 22), but "[a]llegations of conspiracy must 'allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy,'" *Mitchell v. County of Nassau*, 786 F. Supp. 2d 545, 565 (E.D.N.Y. 2011) (quoting *Fariello v. Rodriguez*, 148 F.R.D. 670, 677 (E.D.N.Y. 1993), *aff'd*, 22 F.3d 1090 (2d Cir. 1994)); *see also Phillips v. County of Orange*, 894 F. Supp. 2d 345, 384 (S.D.N.Y. 2012) (same); *Estes El v. Dumoulin*, No. 06-CV-2528, 2011 WL 7767313, at *6 (E.D.N.Y. Feb. 9, 2011) (same), *adopted by* 2012 WL 1340805 (E.D.N.Y. Apr. 18, 2012). Plaintiff has failed to allege "with at least some degree of particularity" any overt acts by Blitstein or Sandler that could be reasonably construed as related to a conspiracy to deprive Plaintiff of his constitutional rights. Thus, even assuming Plaintiff is correct that his involuntary commitment to the mental health system violated his constitutional rights, Blitstein's mere presence at White Plains Hospital is insufficient to state a claim for conspiracy pursuant to § 1983.

Accordingly, Plaintiff has failed to state a § 1983 conspiracy claim against either Blitstein or Sandler.

### 4.  Dismissal Without Prejudice

A complaint should be dismissed without prejudice if the pleading, "'liberally read,' suggests that the plaintiff has a claim that he has inadequately or inartfully pleaded and that he should therefore be given a chance to reframe." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (alterations and citation omitted) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)).  If a complaint, however, has substantive problems and "[a] better pleading will not cure [them]," "[s]uch a futile request to replead should be denied." *Id.* (citing *Hunt v. All. N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Here, Plaintiff has not yet had an opportunity to file an amended complaint, and the Court is unable to discern at this time whether Plaintiff could allege facts sufficient to establish an entitlement to equitable tolling or whether Plaintiff could allege facts sufficient to state claims against the City of New York, Blitstein, or Sandler.  Although Plaintiff has failed to allege sufficient facts in his Complaint or in his subsequent filings with the Court, he will be given an opportunity amend his Complaint to allege facts showing that he suffered from a mental impairment between 1994 and 2016 that blocked his ability to timely file a lawsuit, that a policy of the City of New York was the cause of his injuries, and that Blitstein and Sandler conspired with state actors to deprive Plaintiff of his constitutional rights.  In so doing, Plaintiff should include all relevant facts in the Amended Complaint necessary to establish his claims and should not rely on subsequent filings to make his case.

Because the Court holds that Plaintiff's § 1983 claim is untimely as to all Defendants and substantively deficient as to the City of New York, Blitstein, and Sandler, the Court declines to

consider Defendants' remaining arguments regarding Plaintiff's claims under state law.

Defendants may raise those issues again should they choose to move to file motions to dismiss

Plaintiff's Amended Complaint.

### III. Conclusion

For the foregoing reasons, the Motions are granted and Plaintiff's Complaint is dismissed

without prejudice. Plaintiff must file his Amended Complaint within 30 days of the date of this

Order or face the possibility his case will be dismissed. The Clerk of Court is respectfully

requested to terminate the pending Motions. (Dkt. Nos. 37, 39, 40, 48, 56, 61.)

SO ORDERED.

DATED:     November __, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

26